**Albert Einstein College of Medicine**

YESHIVA UNIVERSITY

# COMMITTEE ON STUDENT PROMOTIONS AND PROFESSIONAL STANDARDS

## I. PREAMBLE

The Committee on Student Promotions and Professional Standards, composed of faculty, students, and staff appointed by the Dean, is responsible for monitoring the academic progress and professional development of students, and provides formal recommendations to the Dean on matters regarding student promotion and graduation.

The medical school faculty establishes principles and methods for the evaluation of student achievement which employs a variety of measures of knowledge, competence, and relational variables, systematically and sequentially applied throughout medical school. Standards of academic achievement, clinical ability and professionalism are high; in keeping with the paramount importance of the welfare of patients, present and future. Committee members and those participating in Committee proceedings are expected to keep this core principle in mind in all matters that arise for deliberation and decision.

The elemental tenets of fundamental fairness and equitable treatment are to guide the Committee's activities, adhering to the principles that all substantially affected parties have the right to be heard, be it in writing or in person, if they so wish; and that appropriately comparable considerations be provided without prejudice to all persons.

The Committee's agenda is to include matters of student academic deficiencies, from any cause, including difficulties progressing through curricular milestones in a timely fashion; matters of student conduct and professionalism and harassment-related matters properly referred from appropriate staff, faculty, or others. The responsibility to assess the fitness of a student to be promoted and/or to receive the MD degree rests with this Committee; with ultimate authority resting with the Dean.

Professional misconduct includes but is not limited to cheating, plagiarism, fabrication, falsification of documents or academic work, intentionally damaging or interfering in the academic work of others, or assisting others in any of these acts. It also includes failure to fulfill responsibilities on clinical rotations or any behavior on the part of a student that is detrimental to the welfare of patients. Failure to meet generally accepted standards of personal integrity, professional conduct or emotional stability, or inappropriate or disruptive behavior towards colleagues, faculty, or other medical staff, also constitutes a failure to meet required professional standards. Behaviors included, but not limited to, those listed herein, are considered within the purview of the Committee on Student Promotions and Professional Standards.

## II. OBJECTIVES OF THE MEDICAL SCHOOL PROGRAM

The Division of Education has established the following overall objectives for the medical school program; spanning affective, cognitive, and skills domains; with broad input from faculty and students.   Additional goals and objectives are established periodically by the Division of Education

SPR- 0001

and other College committee programs and offices. The Committee on Student Promotions and Professional Standards approaches its mission with these principles in hand.

A. The student will manifest commitment to ameliorate the suffering of patients, to respond to needs beyond the relief of pain, and to continue to care compassionately for dying patients when disease-specific treatment may no longer be useful.

B. The student will demonstrate commitment to provide care to patients who are unable to pay, will appreciate the dilemma presented by certain economic arrangements for payment for health care and will evince a commitment to advocate at all times for the interests of his/her patients and for access to health care for all.

C. The student will exhibit the capacity to recognize and accept limitations in his/her knowledge and clinical skills, and to acknowledge personal errors made in the course of practice.

D. The student will treat patients and their families, colleagues and co-workers in a non-judgmental way, with honesty and integrity, with full respect for the confidentiality of privileged information and for individual privacy and dignity.

E. The student will develop an orientation to life-long learning and will acquire the skills needed to maintain this process.

F. The student will acquire a basic knowledge of the biology of the normal human body in its environment, including structure-function relationships in all organ systems, their development, and normal variants thereof. In learning this material, the student is expected to acquire and demonstrate the ability to use accepted descriptive and medical terminology.

G. The student will display an understanding of the role of research in the development of the scientific foundation upon which medicine is based, acquire skills needed for critical evaluation of published findings in the literature, and demonstrate the ability to apply scientific, evidence-based reasoning to the solution of clinical problems.

H. The student will, through the use of written and clinical cases, acquire a knowledge base in the causes, mechanisms, and treatment of human disease as well as in the behavioral and nonbiologic factors that influence health and disease in patients, families, and populations.

I. The student will develop knowledge of the determinants of the incidence and prevalence of certain illnesses within a defined population, and the systematic approaches that might be used to favorably affect those dynamics.

J. The student will demonstrate mastery of the most common clinical, laboratory, radiologic, and pathologic diagnostic manifestations of common illnesses.

SPR- 0002

K. The student will acquire a knowledge base of ethical concepts, and apply this knowledge to moral considerations in clinical cases.

L. The student will acquire a basic knowledge of health policies, health economics, various approaches to the organization, financing, and delivery of health care services and the changing nature of the U.S. health care system.

M. The student will acquire competence in establishing the doctor-patient relationship.

N. The student will demonstrate the ability to perform an adequate patient history that covers all essential aspects of the history and pays particular attention to age, ethnic, and gender issues, and will understand the significance of disparate cultural experiences as they influence a patient's experience of health and disease.

O. The student will demonstrate the ability to perform both a complete and an organ system-specific physical examination, including a mental status examination.

P. The student will demonstrate the ability to perform a specified set of routine technical procedures as defined by the faculty.

Q. The student will acquire the ability to review in a systematic fashion the results of commonly used diagnostic procedures and to differentiate normal from abnormal findings, and develop management strategies (both diagnostic and therapeutic) for patients with common acute and chronic medical, psychiatric, and surgical conditions, and conditions requiring short- and long-term rehabilitation therapy. Students should learn to recognize and institute initial treatment for patients with life threatening emergencies regardless of etiology.

R. The student will demonstrate the ability to communicate effectively, both orally and in writing, with patients, patients' families, colleagues, and others with whom the physician must communicate in carrying out his/her various responsibilities.

S. The student will demonstrate the ability to acquire and manage information, including the use of electronic media.

The above listing of objectives is subject to periodic review and revision by the Division of Education; and such modifications, as approved by the Dean, automatically modify the preceding section of these by-laws, without the requirement of further deliberation or review.

## III. COMMITTEE STRUCTURE AND ORGANIZATION

A. The Committee on Student Promotions and Professional Standards, it's subcommittees, ad-hoc subcommittees, and individual members and staff, are charged with the responsibility to implement the principles and by-laws contained herein. *Matters of academic performance standards, academic progress, professional and ethical conduct, psychological fitness for the practice of Medicine,*

medical or other disability or applicable illness, drug or alcohol abuse, and other appropriate subjects -- constitute the agenda of this Committee. These by-laws will be reviewed at intervals, modified as appropriate, and posted within the College's website.

B.  All Committee appointments and renewals are at the discretion of the Dean, and all voting members are appointed for renewable, two-year terms, including the Committee's chair. The Associate Dean for Students will serve as staff to the Committee, in the role of co-chair. The membership roster of the Committee will consist of no less than twelve voting members, composed of at least nine faculty and at least three students. The chair casts one equal vote. Faculty are to constitute a majority of the voting membership. Up to three AECOM house officers may be members of the Committee. Abstentions are very strongly discouraged; except as effected by a recusal. Voting will be recorded numerically, not as a record of which members cast specific votes. The ex-officio members (not voting) of the Committee will include, at a minimum, the Registrar, the Assistant Dean for Educational Resources, the Associate Dean for Diversity Enhancement, the Assistant Dean for Diversity Enhancement, and the staff of the Director of the Office of Academic Support and Counseling. Staff to the Committee (non-voting) will include the Associate Dean for Students and the staff from that office. In making appointments to the Committee, the Dean will include consideration of nominations from Committee members, and seek participants recognizing prospective members' commitment to and experience in medical education. A spectrum of participants is sought with regard to appropriately representing and serving our College community and society at large.

C.  Student members will participate with equal term length, voting privileges and attendance privileges to voting faculty members. This informational privilege, i.e., to participate in confidential deliberations related to the student members' classmates, is instituted with full recognition of the privacy issues at hand. However, the unique and invaluable nature of student input is considered to outweigh the inevitable privacy considerations; indeed, student participation is considered a cornerstone in assuring the quality of the Committee's discourse and decisions. All Committee members, be they student or faculty, in the process of appointment by the Dean, will be required to pledge to respect the confidentiality of Committee proceedings.

D.  Members are required to voluntarily recuse when a substantial conflict-of-interest occurs. Recusal decisions, ultimately, rest with the Committee chair, should a discussion of appropriate recusal arise. As with faculty, student members are expected to recuse themselves from Committee votes where a personal interest contravenes objectivity or impartiality.

"Conflict of interest," in this setting, signifies when the Committee member is closely personally associated with the student under consideration, as in a roommate, or romantic situation; or if one were the students' personal physician prior to the initiation of proceedings. It is not intended to cover circumstances where the Committee member has prior or additional knowledge of the student under consideration.

E.  Students must provide a signed, written statement when they appear before the Committee that addresses in detail the circumstances leading to their appearance. The contents of this statement may be considered as an important factor in the Committee's deliberations and decisions. Failure to provide this document, similarly, may weigh heavily in the Committee's discussions.

F.  The Committee will be scheduled to meet monthly, and will convene when deemed necessary, at a minimum of five meetings per academic year. Minutes will be recorded by staff and a permanent file of minutes will be kept in the Office of the Associate Dean for Students. All Committee business, including minutes, will be considered sensitive, substantially confidential information and handled with scrupulous discretion, and will be provided to appropriate parties on a need-to-know

basis. Committee members are expected to honor the privacy of all involved parties. Committee members and participants are granted full access to the student records of students who come before the Committee.

G. Voting is required to approve any and all disciplinary and/or remedial actions recommended by the Committee, including but not limited to withdrawal, suspension, remediation programs, involuntary deceleration, assignment of additional supervision, and so on. A simple majority of the present voting members constitutes a majority. In the event of a tie vote, the motion fails to carry. A minimum of eight voting members must be present to effect a formal Committee recommendation. If any meeting (e.g., an emergency meeting) is convened with less than eight voting members present, its recommendation(s) are provisional and must be voted upon at the next appropriate opportunity to be fully endorsed and have the full authority of the Committee in force. Informal or provisional recommendations may be reversed or modified when the eight or more voting member quorum is assembled.

## IV. ACADEMIC PROGRESS

A. The Committee on Student Promotions and Professional Standards is charged with monitoring the academic progress of each student, throughout their enrollment at the College. The faculty of each discipline, by and large, develop and implement the standards of achievement by students in the study of that discipline. Examinations are intended to measure cognitive learning, mastery of basic clinical skills, and the ability to use data in realistic problem solving. Clinical departments develop and implement a system of assessment which assures that students have acquired and can demonstrate on direct observation the core clinical skills and behaviors needed in subsequent medical training and practice. Communication skills and ethical conduct are integral to the education and effective function of physicians. There is instruction and evaluation of these elements as they relate to physician responsibilities, including communication with patients, families, colleagues and other health professionals. The Committee's activities are to be informed by the above assessment components, as well as any other credible measures and information that may be available.

B. The Committee must recognize in its deliberations that the matters at hand will often be less than straightforward, inasmuch as purely academic failure has become a vanishing category of agenda item. Some cases blur the boundary between academic failure and learning disability, between academic failure and anxiety or depressive disorder, between academic failure and alcohol/drug abuse, between academic failure and ethical lapses, between academic status and putative disability status, between academic status and socio-economic disadvantage, between academic status and alleged harassment, and so on. This conflation of nominally separate domains demands the full attention and most careful judgment from those involved in the Committee's processes. *There must be minimum performance standards expected of all students, regardless of the above or other distinctions, which are established and applied equitably to all students. The Committee is to consider the welfare of patients, present and future, to be paramount. There comes a point when Committee member's relationship to students must modulate from strict advocacy (or therapeutics) to one of critical evaluation; mindful of our obligation to society at large.*

C. The historic and unique responsibility of a medical school includes the selection and education of medical students, culminating in the award of the MD degree, and the Committee on Student Promotions and Professional Standards is charged with upholding our implicit obligation to society to award this degree only when it is appropriate to do so. To this end, these by-laws have been developed and refined over time, but this text cannot stand without the reasoned and cautious judgment of a dedicated Committee membership. These standards sometimes are stated in a fashion that is not susceptible to quantification or to precise definition because the nature of the evaluation is

qualitative in character and can be accomplished only by the exercise of professional judgment by qualified persons. The Committee must apply these principles equitably and consistently; yet must recognize that each circumstance is unique, requiring fact-finding and the application of case-specific deliberations and recommendations.

## D. General Procedures

1. Students must complete the full medical program curriculum, usually completed in four years, in a period of time not exceeding seven years, under any circumstance.

2. A student who is found to have misrepresented him or herself in the admissions process or thereafter is subject to Committee action; and this may be grounds for dismissal. This is to include not only the provision of false or misleading information, but applies as well to information that may have been omitted or concealed. It is the Committee's responsibility to assess the gravity of the offense and to respond proportionately.

3. Students are expected to successfully complete all course work of a given academic year before they may progress to the subsequent academic year. This principle applies absolutely to the transitions at the Year II/Year III boundary and at the Year III/Year IV boundary. The pre-clinical course work pattern is to be more flexible; particularly when idiosyncratic decelerated course schedules are tailored for individual students.

4. The criteria for the evaluation of students in any course or clinical rotation is the prerogative of the appropriate course, clerkship, or other leader; with the procedural oversight of the Associate Dean for Students.

5. All grades and evaluations may be appealed by a student, to be primarily directed to the applicable course, clerkship, or other responsible faculty member; with the procedural oversight of the Associate Dean for Students. Neither the CSPPS nor the Dean will address the appeal of grades or clinical evaluations.

6. Upon the recommendation of a course, clerkship, or other leader; and with the consent of the Associate Dean for Students or the Committee on Student Promotions and Professional Standards, remediation and re-examination may be offered to the student who fails a course, within the limits provided elsewhere in these policies.

7. Modified curricular programs, for remediation or other reasons, may be arranged to assist students with special learning requirements, as per the Associate Dean for Students in consultation with the Chair of the Committee on Student Promotions and Professional Standards.

8. The College supports an extensive MD-PhD program; wherein students participate in an amalgam of medical school and graduate school curricula. As such, a number of exemptions to these by-laws and other customary procedures are required. For example, the overall "seven-year rule" for earning the MD degree does not apply to the MD-PhD students. In general

SPR- 0006

terms, the Year I and Year II curricula for the MD-PhD students are not within the jurisdiction of the Committee; whereas the clinical training (clerkships and similar) for the MD-PhD students does fall under the Committee's jurisdiction. The interface between programs is best managed by the Associate Dean for Students and the Committee Chair. It is understood that a bright line cannot be drawn between the operations of the MD-PhD program and the MD program; and that ongoing cooperation and shared administrative responsibility is in order. Oversight during Years I and II rests primarily with the director and coordinating committees of the MD-PhD program. Professionalism and other core standards are not relaxed for students seeking the MD degree, regardless of their participation in special programs; degree-earning or otherwise.

9. Upon the written request of the Director of the Sue Golding Graduate Division of AECOM, this Committee is to make itself available to assist with the procedural disciplinary processes of that Division. This is generally expected to occur when one of the graduate degree-granting Departments has dismissed a graduate student from its programs and laboratories. The subsequent steps available to the student (as per the policies of the SGGD), are directed extra-departmentally, to the administrative core as managed by the SGGD Director and his chosen faculty and staff advisors. The Committee on Student Promotions and Professional Standards may be asked to function in such advisory capacity to the SGGD Director, and will do so following its own procedures such as these may be properly and practically adapted, in good faith, to the "culture" and policies promulgated in the SGGD. Committee recommendations move to the SGGD Director (and at his/her discretion, on to the Dean), for further implementation or consideration. The minimum principles for the CSPPS in these circumstances is to give reasonable review to "both sides of the story," to included the written and verbal input of the student. It is not expected that the full complement of procedures applicable to medical students coming before the CSPPS will be applicable or available for this advisory function of the Committee to the SGGD Director. The CSPPS membership includes faculty researchers, as a matter of custom, who will provide valuable insight in such cases. The Committee may invite, at the Chair's sole discretion, additional persons should special expertise or perspective be warranted, including but not limited to the SGGD Director and the SGGD Registrar. The Committee's minutes (and other pertinent materials) as pertaining to these cases are released to the SGGD Directors and Registrar for disposition and record-keeping purposes.

10. The College does not accept transfer students into the medical school program. In exceptional circumstances the Dean may accept a student for transfer, generally under circumstances where a qualified student at another medical school is separated from a spouse in our program. The conditions would be case specific.

11. The Committee in carrying out its charges is not bound by the formal rules of evidence; and is directed to obtain and consider information it considers credible and relevant to its mission.

12. The various elements of these by-laws are severable. Should for any reason one or more by-laws are not or cannot be followed -- the other by-laws are nonetheless applicable. The Committee recognizes that many rules or practices are not fully enforced, in society at large and in educational and health care organizations. This occurs for many reasons, some simply logistical. For purposes of Committee deliberations, this cannot serve as meaningful justification for behaviors that are the subject of Committee attention or discussion.

13. A student will have access to a process of appeal whenever the CSPPS recommends withdrawal, or Committee actions that would necessarily lead to the postponement of that student's date of graduation.

14. Failing three exams provokes "advisory status" for a student, who will be formally counseled by the staff of the Office of Education. Four or five failed exams provokes "review status" and further counseling. The sixth failed exam triggers a "probationary status," and provokes appearing before the Committee. Seven exams is grounds for dismissal. Eight failed exams requires the student be dismissed. Failing any exam or course twice warrants dismissal. Committee members are encouraged to consider exam scores as reliable indicators of knowledge - rather than accepting the common argument that some students are poor test-takers yet nonetheless have a strong knowledge base. The count for exams is cumulative throughout the medical school program, and includes the NBME examinations.

15. Formal Committee actions are effected by written correspondence from the Associate Dean for Students; and will often be augmented by verbal communications. The written record prevails should any contradiction between written and verbal communication be asserted. A permanent file of all official correspondence will be maintained by the Office of the Associate Dean for Students, and where appropriate, the Registrar.

16. Attorneys may not be present at any of the Committee's proceedings, to include the whole Committee or any meeting of persons carrying out the Committee's business. The sole exception is a medical student who is also an attorney who may serve as a Committee member, as a participant in proceedings, or as the student under consideration.

17. A student who has been dismissed (or who has withdrawn) from the College may not be readmitted under any circumstances, barring a proper court order, without exception. This includes barring re-application through the Admissions Committee to re-begin the program; and bars entry via application to the MD-PhD program. In addition, an application to the PhD-only program or for employment at the College would properly provoke communication with those programs, to include information customarily kept private in Committee records.

18. The Committee may opt, in some circumstances, to appoint ad-hoc subcommittees, or to ask one or more Committee members to pursue appropriate tasks related to the workings of the Committee.

19. When a course or clinical rotation grade or narrative evaluation is the basis for a student coming to the attention of, or is the proximate reason a student is invited to appear before the Committee - should the source of said information later retract or modify the original stimulus - this does not abort the process or reverse the impact of the original information (except in the case of arithmetic error, or error of identity, or similar). Students pressuring evaluating faculty to change adverse information so as to avoid or minimize Committee procedures should expect the Committee to take this into consideration.

20. Student transcripts will accurately and permanently reflect courses or clinical rotations that have resulted in a failing final grade (after one approved make-up examination). Repeated courses or clinical rotations will subsequently appear as well, with the corresponding final grade.

Year I of medical school, for many students, is a time of considerable transition and even struggle. In recognition of the fact that a substantial number of students who stumble academically in Year I will be on solid footing by Year II and thereafter – Year I failed courses, when passed on the second attempt, will be deleted from the transcript. The course name and the passing grade will appear on the transcript in the time period in which the repeat course was completed.

21. As per the by-laws, a student may seek advisement from AECOM community members or family members, and at the student's written request, access to educational records may be specifically granted for this purpose. A student may ask up to three of these advisors to communicate directly to the Committee, in writing or in person. Students may elect to be accompanied during appearances before the Committee by one of the aforementioned advisors (family or members of the College community), who may play an advisory or advocacy role on the student's behalf.

22. A student may be indefinitely removed from curricular participation (until the matter is settled) for being delinquent with regard to important non-academic College policies, e.g., vaccination or other health-related requirements, housing-related, financial, etc. This is implemented for cause and after a minimum of two notices (at least 8 weeks apart) to the affected student, by the Associate Dean for Students with the oversight of the CSPPS.

23. Students having difficulties, especially those involved with the Committee, are urged to consider the availability of a "leave of absence" during which etiological factors can be properly analyzed and addressed - prior to further adverse affect on the student's academic or professionalism record and reputation. The decision to "take a break" and deal with distractions or illnesses can sometimes be the key decision in avoiding disciplinary actions.

24. Recording devices are not permitted during any Committee proceedings.

25. Proper notice of students is defined as confirmed delivery by U.S. Mail

or private delivery services, e.g. Federal Express, etc. All crucial correspondence, from all parties, are appropriately documented in this fashion. The local address on record with the Registrar will be used -- and with written confirmation of delivery to this address (signature not required) formal notice is fully established for purposes of this policy. Students are required to maintain their current address on file with the registrar at all times and if off-campus are responsible for receiving and responding to official correspondence.

26. Minor deviation from this policy does not result in any right of an appeal. We are operating in an academic environment; and are neither equipped nor inclined to legalistic precision in all matters at all levels of detail. The Committee(s) are not specifically bound by "precedent," nor do these by-laws constitute a complete listing of all the rules, practices, and policies that are expected and enforced related to students in our academic and clinical environments.

27. Appropriately considered and approved changes to these by-laws are not automatically postponed with regard to their effective date so as to "grandfather" the change for current students. Depending on the issue at hand, the Committee will use its discretion to set a delay, only if deemed necessary, prior to the implementation of any altered or new by-laws.

28. If a student fails to respond to proper correspondence for a period exceeding 120 days - they may be administratively dismissed from the College. As stated elsewhere in the by-laws, critical correspondence will be sent, by confirmed delivery means, to the student address last provided by the student to the Registrar's Office.

29. All substantial changes to these by-laws shall be reviewed by and discussed with the Senate Council of the Faculty Senate prior to full implementation. These by-laws are subject to change without notice.

## E. Pre-Clerkship Curriculum

1. The pre-clerkship curriculum, usually completed in the initial two years, must be completed within a four year period from the date of matriculation, under any circumstance.

2. A pre-clerkship course ends in "final" failure when both of the following conditions have been met.

> a. After the course's regularly planned "during-the-course" and "end-of-the-course" examinations have been graded -- the course leader determines that the student has not passed the course, ("provisional" failure), and then;

> b. After a single additional course "make-up" examination has been failed as determined by the course leader. This constitutes "final" failure.

c. Please note that a course leader may compute a failing grade with non-examination related elements, e.g., small group participation, etc.

d. Please note that one is not always eligible for a "make-up" examination.

3. Make-up examinations in the pre-clerkship curriculum are scheduled in advance, and planned for only one date per year, per course. First year make-up examinations will be offered to allow for timely entry into the second year. Second year make-up examinations will be offered to allow for timely entry into the clerkship curriculum. Failing to appear for a scheduled exam without prior written permission will be the procedural equivalent of failing said exam.

4. Students will be allowed to complete requirements for only two provisionally failed courses (i.e., provisionally failed pending the make-up exam) per year. In other words, a student will only be allowed to sit for two make-up exams per academic year; a maximum of two in Year I, a maximum of two in Year II, and a maximum of two in Year III. Additional failures (more than two in any academic phase/year) are not rectifiable, and become "final" failures.

5. Because of the scope of material included in certain comprehensive courses that have been established in the pre-clerkship period, a student who must complete such courses by make-up examination will not be permitted to take make-up examinations in any other courses during that same curricular year. In Year I, this applies to the Molecular and Cellular Foundations of Medicine and to the Anatomy course, in Year II, this applies to the Nervous System and Human Behavior course, and the Microbiology/Infectious Disease course.

6. If a student has a "final" failure in a pre-clerkship course, as defined above, and fails a subsequent examination (mid-term or final) when repeating that same course – this leads to ineligibility to continue in the medical school curriculum. Withdrawing during the repeat course, after one or more examinations have been taken, also leads to ineligibility to continue in the curriculum.

7. A student's failure, on the first attempt, to successfully complete a repeated portion of the pre-clerkship curriculum -- is grounds for withdrawal from the College. Withdrawing from a repeated course (after taking one or more exams in that course) – is grounds for withdrawal from the College.

8. A student who makes prior arrangements to miss a scheduled examination in the pre-clerkship period, is expected to alternately sit for the scheduled make-up examination. Should he/she fail to pass that make-up -- because it is his/her first attempt -- an additional opportunity will be provided to make-up that course examination in a timely fashion.

9. In the event that a course syllabus, exam or course instructions (or

similar) contradict these by-laws - the by-laws take precedence. The Committee will consider such contradictory signals, properly, as possible mitigating factors in any given case.

10. Students experiencing difficulty with the pre-clerkship curriculum, evidenced by multiple examination failures (any examinations), will be advised to enter a revised curriculum (deceleration, course repetition, leave of absence, or other). A plan will be developed with the Associate Dean for Students with the oversight of the Committee.

11. A student who has a "final" failure in any pre-clerkship course must repeat that course in the next academic year. A modified schedule for the next year (a deceleration plan) will be developed in consultation with the Associate Dean for Students, with the assistance of faculty advisors as appropriate, and with the oversight of the CSPPC.

12. If a student does not agree to a curricular plan as recommended by the Associate Dean for Students, they may appeal, in writing and/or in person, to the Committee -- who will be the arbiter and final word on the matter. If the Committee's decision postpones the student's date of graduation, a procedural (written) appeal is available to the Dean.

13. The failure of three exams prior to the winter recess period of Year I, mid-terms or finals, for any reason, will automatically require the development of a decelerated curriculum -- without recourse to Committee or the Dean -- even if graduation is thereby postponed.

## F. Clerkship Curriculum

1. Until all course requirements are satisfied for Years I and II, a student may not begin a clerkship or clinical assignment (beyond those clinical assignments that are routinely permitted in Years I and II).

2. The Year III curriculum includes the required clerkships in Internal Medicine, Surgery, Pediatrics, Family Medicine, Obstetrics & Gynecology, Psychiatry and Radiology. It further includes a two week clinical rotation that can be spent in a variety of clinical departments.

3. A clerkship is formally failed, when at the conclusion of the clinical assignment, and after the relevant information has been collected (initial exam scores, clinical evaluations, etc.) the appropriate clinical clerkship faculty person determines a failing grade exists -- and -- when a single subsequent written make-up exam is failed; if the initial failing grade was remediable by simply passing the repeated written exam.

4. A single formally failed clerkship requires the Committee to discuss the academic progress of the affected student. The Committee may allow repetition of only the failed clerkship, or may require repetition of additional portions of the clerkship year, based on review of the student's entire record.

SPR- 0012

5. A repeated clerkship cannot be graded "Honors."

6. Marginal performance ("low pass") in one or more clerkships warrants review by the Committee, and may require repetition of a portion, or the entire clerkship year, based on review of the student's entire record. In addition, a pattern of marginal performance may be grounds for withdrawal.

7. A student will only be allowed to sit for two make-up exams during the clerkship cycle. In other words, for the six required clerkships in Year III (and the Year IV Neurology clerkships), only two may be passed via make-up examinations. Any additional clerkship failures will not be remediable via make-up examination, i.e., the failing grade becomes final.

8. A student who passes a clerkship via a make-up examination, for any reason, may not receive an Honors grade in the clerkship. An exception may be allowed in the case of maternity or on a disability-related basis.

9. A student who wishes to appeal a grade or narrative evaluation in a required clerkship is directed first to the signatory on the evaluation, secondarily to the departmental coordinator for that clerkship, and finally to the Associate Dean for Students. Neither the Committee nor the Dean will address these appeals.

10. If a clerkship is formally failed (see above), the narrative evaluation of the failed rotation -- for purposes of the Dean's Letter compilation -- will be incorporated into the narrative portion of the subsequent (repeated) rotation's evaluation. In other words, although the transcript will indicate both the failing grade and the subsequent passing grade; the Dean's Letter series of narrative evaluations will show only one, composite, narrative evaluation incorporating both the initially failed and subsequently completed rotation -- which is composed by the applicable clinical department. [The permanent student file will contain both documents; the failed initial clerkship evaluation form with the original narrative, and the second (repeated) clerkship evaluation form that contains the narrative portion addressing both clerkship rotations.]

11. A recommendation for withdrawal may be made based on a pattern of persistent marginal performance in the clerkships.

12. A Dean's Letter will be provided only after satisfactory completion of the entire Year III clerkship cycle. MD-PhD students are exempt from this requirement when the reason for their incomplete clerkship sequence relates solely to the matter of MD-PhD program scheduling.

13. A student absent, for any reason, from a clerkship for a total number of days that exceeds the number of weeks in that clerkship; is not eligible to successfully complete the clerkship on that attempt. An exemption is needed for MD-PhD students who may need to attend residency interviews during a clerkship.

14. If a student fails the clerkship final examination, and subsequently fails a single make-up examination, the clerkship must be repeated in toto prior to re-attempting the written exam. A third failed attempt in a given departmental exam and the student becomes ineligible to continue in the curriculum.

15. A second formally failed clerkship, and the student becomes ineligible to continue in the curriculum. This includes failing, or withdrawing from a repeated clerkship, for any reason.

## G. Senior Curriculum

1. The Year IV curriculum includes a required on-campus sub-internship in Internal Medicine or Pediatrics or Family Medicine, of two months duration. Additional requirements for this period include a one-month assignment in Ambulatory Care, and a one-month clerkship in Neurology. With special dispensation from the respective coordinators, these latter two rotations may be taken off-campus.

2. A graduation requirement, which may be accomplished during either the Year III or Year IV curriculum, is a minimum two-week clerkship in Geriatrics. If done off-campus, a four week rotation is required.

3. A student absent from a required senior clinical rotation, for any reason, for more days than that rotation's length in weeks, is not eligible to complete that rotation on that attempt.

4. Subject to approval, the senior year includes electives designed to supplement the required courses and to provide opportunities for students to pursue individual academic interests. Each elective month of Year IV must be accounted for by a faculty- or supervisor-signed evaluation. This includes off-campus, clinical, research, and/or months dedicated to Independent Scholar's Project work. Other than one month of vacation, all senior months must be officially accounted for with academic activities.

5. The senior year is required to be twelve months in duration, or longer. Approved exceptions to the twelve-month minimum are maternity/paternity/disability leave, or completing one postponed or repeated Year III clerkship, but the senior program may not be less than ten months in duration (includes one month vacation), under any circumstance. You must commence the senior program on or about August 1st, in order to graduate with that senior class. If you commence the senior program on or about September 1st, you are eligible to graduate no sooner than the following July 1st, and so on. Diplomas are dated late May or June for graduating with the usual "on schedule" senior class.

6. A student's failure, on the first attempt, to complete successfully a repeated subinternship, ambulatory care rotation, or neurology clerkship -- leads to ineligibility to continue in the curriculum.

7. It is strongly recommended that the Step 2 examinations of the USMLE

be taken prior to the end of January of Year IV.

8. A student who fails either the required sub-internship or the required ambulatory care rotation or the required clerkship in Neurology will be required to remain in the College of Medicine for an additional year and must repeat the failed course(s). At the discretion of the Committee, if the overall academic record warrants, a student may be allowed to use a maximum of two months of elective time to remedy a deficiency in one of these rotations and may, in that case, not be required to stay for an additional year.

9. Course failures or deficiencies in the senior year, in elective course work, will be reviewed by the Committee. A student who fails an elective course will be required to repeat the course, or a course of similar academic value. A student who fails two elective courses will be, at a minimum, required to repeat the year, and may be withdrawn.

10. From time-to-time, a senior student is in the midst of Committee deliberations when graduation becomes imminent. Rather than allow the shortage of time to distort proper process - the Committee may elect to allow a student to participate in the graduation ceremonies - but to do so without receiving the MD diploma and without being actually awarded MD status. No other exceptions are recognized where an "empty tube" may be awarded - except for the two special cases: a.) when a student's financial obligations have not been met, as per the Student Finance Officer (who is the final word on such matters), and b.) the Associate Dean for Educational Affairs indicates that the required Scholar's Project has not been completed.

SPR- 0015

# VI. APPEALS OF COMMITTEE DECISIONS

A. Students may appeal certain decisions and recommendations of the Committee, as indicated elsewhere in these by-laws.

B. Appeals must be presented to the Associate Dean for Students in writing, within ten days of receipt of notification of the Committee's decision.

C. The Associate for Dean for Students will assist the student in the preparation of an appeal if requested to do so. The student will be notified of the date of the Committee meeting at which the appeal will be heard at least seven days prior to that meeting.

D. The student has the right to present a written and/or in-person appeal to the Committee at the next appropriate meeting. A report from the student, as well as from informed members of the Committee, including the Associate Dean for Students, will all be heard.

E. When making a personal presentation to the full Committee, or to an information-gathering person or group supporting the Committee's deliberations, the student may be assisted by a faculty advisor and may request that as many as three advocates from among the faculty, student body, or family members, speak or write on his/her behalf.

F. As the deliberations of the Committee are substantially academic in nature, neither the student nor the College will be represented by legal counsel at meetings of the Committee, staff, or appropriate designees. Advocates for the student, whether from the academic community or family, also may not be attorneys.

G. If the appeal is followed by a Committee decision to recommend withdrawal, the Associate Dean for Students will inform the student that this recommendation is being sent by the Committee to the Dean, in writing, within seven days. If the student wishes to appeal this recommendation of the Committee, he/she may do so, in writing, within ten days, by verified delivery. If no appeal is submitted to the Dean within the ten day period, the decision of the Committee becomes final.

H. Decisions of the Committee recommending the withdrawal of a student from the College of Medicine or postponing the date of a student's graduation generally gives rise to the privilege of an appeal. This does not preclude the favorable consideration of requests from students for appeal of other decisions.

I. Extensions of the originally planned length leaves of absence (based on academic difficulty) shall be given only under extraordinary circumstances. Such extensions are managed by the Associate Dean for Students with the advice of the Committee or its chair.

SPR- 0016

J. Students under Committee consideration who attempt to avoid or compromise the Committee's procedures or authority will have such actions reported to the Committee, as appropriate, for consideration.

K. The Dean alone may withdraw a student permanently from the College of Medicine, therefore a decision made by the Committee in favor of withdrawal is effected as a recommendation from the Committee to the Dean.

L. The Dean will not alter any decision of the Committee nor reject a recommendation for withdrawal without appropriate consultation, which at a minimum would involve the Committee Chair.

M. The Dean, in exceptional circumstances, may exercise his/her option to act independently of the Committee, if he/she deems this necessary as a temporary measure or as the full process in a given case.

## VII. ILLNESSES, DISABILITIES, AND DISABLING CONDITIONS

As required by the Rehabilitation Act of 1973 (PL 93-112) and the Americans with Disabilities Act of 1990 (PL 101-336), the Albert Einstein College of Medicine will provide reasonable accommodation(s) for students with appropriately diagnosed and documented disabilities, provided that such accommodation does not change the fundamental nature of the educational program or adversely affect the safety of patients, staff, or fellow trainees. Further related details of this policy follow; with some variance in procedures and limits as per the nature of the condition. Note that the quality/quantity of medical documentation required to take a "leave" is generally less than that required for a student seeking ongoing accommodations while engaged in the curriculum and/or taking examinations. In seeking accommodations of any type for any reason(s) (disability-related or otherwise), students are required to complete applicable paperwork and provide the required background data and consent access to same.

### A. Temporary Medical/Disability Leave

In the event of a short-term, non-recurring illness or disability that renders a student temporarily unable to participate in all or part of the medical school program (including pregnancy), that student is entitled to reasonable accommodation. When a student's capacity to participate in the medical school program is compromised by acute medical illness (up to six months approximate duration), the student may request medical leave status; relieving him/her of curricular duties. The student must provide a properly documented diagnosis from a qualified professional with acceptable credentials and recognized expertise. This documentation is to be provided to the Associate Dean for Students. Additional, ongoing documentation may be required in some cases. The College reserves the right to require further evaluation before approving request for leave(s) and to make an individualized judgment as to the most appropriate plan. The safety of patients and others, including the student him/herself, will also be considered. The Associate Dean for Students may require a student to be on medical leave.

The start and end dates of this leave status may appear on the transcript. The student-on-leave may in some cases remain on the class roster (which entitles one to housing privileges, medical and disability insurance coverage, etc.) for up to six months, after which other arrangements may become necessary. Policy regarding medical and related benefits are governed by contract language that is not subject to the authority of these by-laws or the Committee on Student Promotions and Professional Standards.

If a transient medical condition only partly compromises a student's capacity to participate in the medical school program, efforts will be made to accommodate the problem, as stated above. For example, a student with a fractured dominant hand might be provided writing assistance for the purposes of examinations.

## B. Longer-Term Disability/Illness Conditions

The Albert Einstein College of Medicine provides reasonable and appropriate accommodations in accordance with the Americans with Disabilities Act for individuals with documented disabilities who demonstrate a need for accommodation. The following information is provided for students, College personnel who work with students, interested faculty, and others who may be involved in the process of discussing and/or documenting a request for accommodations. Much of the following is applicable to testing-related accommodations, but these procedures are applicable, as well, to other types of requested accommodations. Applicants requesting test or other accommodations should share these guidelines with their evaluator, therapist, treating physician, etc., so that appropriate documentation can be assembled to support the request for test or other accommodations.

Accommodations for disabilities must be handled or cleared centrally, through the Office of Education's designated staff members. Approaching course leaders or other "local" staff or supervisors – without regard to the College's published policies (which include detailed documentary requirements) – will provoke referral to the Associate Dean for Students and/or the Committee on Student Promotions and Professional Standards. It may similarly jeopardize one's academic record as this record may have been affected by the improperly "authorized" accommodations.

The Americans with Disabilities Act of 1990 (ADA) and accompanying regulations define a person with a disability as someone with a physical or mental impairment that substantially limits one or more major life activities such as walking, seeing, hearing, or learning. The primary purpose of documentation is to validate that the individual is covered under the Americans with Disabilities Act as a disabled individual.

The purpose of accommodations is to provide equal access to the elements and the totality of medical education. Our intent is that accommodations "match up" with the identified functional limitation so that the area of impairment is alleviated by an auxiliary aid or adjustment to the testing procedures and/or to an other aspect of medical education, e.g., hearing a lecture in the case of a hearing-impaired student. Functional limitation refers to the behavioral manifestations of the disability that impede the individual's ability to function, i.e., what someone cannot do on a regular and continuing basis as a result of the disability. For example, a functional limitation might be impaired vision so that the individual is unable to view an examination in the standard lighting conditions. An appropriate accommodation might be additional task lighting. It is essential that the documentation provide a clear explanation of the functional impairment and a rationale for the requested accommodation; whether related to examinations or other medical student functions.

While presumably the use of accommodations in the identified activity will enable the individual to better demonstrate his/her knowledge or other skills, accommodations are not a guarantee of improved performance, or of successfully meeting required performance standards.

## General Guidelines:

The following guidelines are provided to assist the applicant in documenting a need for accommodation based on an impairment that substantially limits one or more major life activities.

Documentation submitted in support of a request may be referred to experts in the appropriate area of disability for impartial professional review. The student must personally initiate a written request for accommodations and must provide appropriate consent to allow for communication/correspondence with medical or other providers/evaluators of the student.

To support a request for test accommodations, please submit the following:

1. Completed Accommodations Request Questionnaire (ARQ), and associated consent forms.

2. A detailed, comprehensive written report describing your disability and its severity and justifying the need for the requested accommodations.

The following characteristics are expected of all documentation submitted in support of a request for accommodations. Documentation must:

1. State a specific diagnosis of the disability.

2. A professionally recognized diagnosis for the particular category of disability is expected, e.g., the DSM-IV diagnostic categories for learning disabilities.

3. Be current.

Because the provision of reasonable accommodations is based on assessment of the current impact of the student's disability on the testing or other student activity, it is in the individual's best interest to provide recent documentation. As the manifestations of a disability may vary over time and in different settings, in most cases an evaluation should have been conducted within the past three years.

Describe the specific diagnostic criteria and name the diagnostic tests used, including date(s) of evaluation, specific test results and a detailed interpretation of the test results.

This description should include the results of diagnostic procedures and tests utilized and should include relevant educational, developmental, and medical history. Specific test results should be reported to support the diagnosis, e.g., documentation for a student with multiple sclerosis should include specific findings on the neurological examination including functional limitations and MRI or other studies, if relevant.

Diagnostic methods used should be appropriate to the disability and current professional practices within the field. Informal or nonstandardized evaluations should be described in enough detail that other professionals could understand their role and significance in the diagnostic process.

Describe in detail the individual's limitations due to the diagnosed disability and explain the relationship of the test results to the identified limitations resulting from the disability. The current functional impact on physical, perceptual and cognitive abilities should be fully described.

Recommend specific accommodations and/or assistive devices including a detailed explanation of why these accommodations or devices are needed and how they will reduce the impact of the identified functional limitations.

Establish the professional credentials of the evaluator that qualify him/her to make the particular diagnosis, including information about license or certification and specialization in the area of the

diagnosis. The evaluator should present evidence of comprehensive training and direct experience in the diagnosis and treatment of adults in the specific area of illness or disability.

If no prior accommodations have been provided, the qualified professional expert should include a detailed explanation as to why no accommodations were given in the past and why accommodations are needed now.

**Additional Guidelines for Learning Disabilities:**

Documentation for applicants submitting a request for accommodations based on a learning disability or other cognitive impairment should contain all of the items listed in the General Guidelines section, above. The following information explains the additional issues documentation must address relative to learning disabilities.

The evaluation must be conducted by a qualified professional. The diagnostician must have comprehensive training in the field of learning disabilities and must have comprehensive training and direct experience in working with an adult population.

Testing/assessment must be current. The determination of whether an individual is significantly limited in functioning according to Americans with Disabilities Act (ADA) criteria is based on assessment of the current impact of the impairment. (See General Guidelines). A developmental disorder such as a learning disability originates in childhood and, therefore, information which demonstrates a history of impaired functioning should also be provided.

Documentation must be comprehensive. Objective evidence of a substantial limitation in cognition or learning must be provided. At a minimum, the comprehensive evaluation should include a diagnostic interview and history taking.

Because learning disabilities are commonly manifested during childhood, though not always formally diagnosed, relevant historical information regarding the individual's academic history and learning processes in elementary, secondary and postsecondary education should be investigated and documented. The report of assessment should include a summary of a comprehensive diagnostic interview that includes relevant background information to support the diagnosis. In addition to the candidate's self-report, the report of assessment should include:

1. A description of the presenting problem(s);

2. A developmental history;

3. Relevant academic history including results of prior standardized testing, reports of classroom performance and behaviors including transcripts, study habits and attitudes and notable trends in academic performance;

4. Relevant family history, including primary language of the home and current level of fluency in English;

5. Relevant psychosocial history;

6. Relevant medical history including the absence of a medical basis for the present symptoms;

7. Relevant employment history;

SPR- 0020

8. A discussion of dual diagnosis, alternative or co-existing mood, behavioral, neurological and/or personality disorders along with any history of relevant medication and current use that may impact the individual's learning;

9. Exploration of possible alternatives that may mimic a learning disability when, in fact, one is not present;

A psychoeducational or neuropsychological evaluation; The psychoeducational or neuropsychological evaluation must be submitted on the letterhead of a qualified professional and it must provide clear and specific evidence that a learning or cognitive disability does or does not exist.

Assessment must consist of a comprehensive battery of tests.

A diagnosis must be based on the aggregate of test results, history and level of current functioning. It is not acceptable to base a diagnosis on only one or two subtests.

Objective evidence of a substantial limitation to learning must be presented.

Tests must be appropriately normed for the age of the patient and must be administered in the designated standardized manner.

Minimally, the domains to be addressed should include the following:

1. Cognitive Functioning: A complete cognitive assessment is essential with all subtests and standard scores reported. Acceptable measures include but are not limited to: Wechsler Adult Intelligence Scale-III (WAIS-III); Woodcock Johnson Psychoeducational Battery-Revised: Tests of Cognitive Ability; Kaufman Adolescent and Adult Intelligence Test.

2. Achievement: A comprehensive achievement battery with all subtests and standard scores is essential. The battery must include current levels of academic functioning in relevant areas such as reading (decoding and comprehension) and mathematics. Acceptable instruments include, but are not limited to, the Woodcock-Johnson Psychoeducational Battery-Revised: Tests of Achievement; The Scholastic Abilities Test for Adults (SATA); Woodcock Reading Mastery Tests-Revised. Specific achievement tests are useful instruments when administered under standardized conditions and when interpreted within the context of other diagnostic information. The Wide Range Achievement Test-3 (WRAT-3) and the Nelson-Denny Reading Test are not comprehensive diagnostic measures of achievement and therefore neither is acceptable if used as the sole measure of achievement.

3. Information Processing: Specific areas of information processing (e.g., short, and long-term memory, sequential memory, auditory and visual perception/processing, auditory and phonological awareness, processing speed, executive functioning, motor ability) must be assessed. Acceptable measures include, but are not limited to, the Detroit Tests of Learning Aptitude Adult (DTLA-A), Wechsler Memory Scale-III (WMS-III), information from the Woodcock Johnson Psychoeducational Battery Revised: Tests of Cognitive Ability, as well as other relevant instruments that may be used to address these areas.

4. Other Assessment Measures: Other formal assessment measures or nonstandard measures and informal assessment procedures or observations may be integrated with the above instruments to help support a differential diagnosis or to disentangle the learning disability from co-existing

SPR- 0021

neurological and/or psychiatric issues. In addition to standardized test batteries, nonstandardized measures and informal assessment procedures may be helpful in determining performance across a variety of domains.

Actual test scores must be provided (standard scores where available). Evaluators should use the most recent form of tests and should identify the specific test form as well as the norms used to compute scores. It is helpful to list all test data in a score summary sheet appended to the evaluation.

Records of academic history should be provided. Because learning disabilities are most commonly manifested during childhood, relevant records detailing learning processes and difficulties in elementary, secondary and postsecondary education should be included. Such records as grade reports, transcripts, teachers' comments and the like will serve to substantiate self-reported academic difficulties in the past and currently.

A differential diagnosis must be reviewed and various possible alternative causes for the identified problems in academic achievement should be ruled out. The evaluation should address key constructs underlying the concept of learning disabilities and provide clear and specific evidence of the information processing deficit(s) and how these deficits currently impair the individual's ability to learn. No single test or subtest is a sufficient basis for a diagnosis.

The differential diagnosis must demonstrate that:

1. Significant difficulties persist in the acquisition and use of listening, speaking, reading, writing or reasoning skills.

2. The problems being experienced are not primarily due to lack of exposure to the behaviors needed for academic learning or to an inadequate match between the individual's ability and the instructional demands.

3. A clinical summary must be provided. A well-written diagnostic summary based on a comprehensive evaluative process is a necessary component of the report. Assessment instruments and the data they provide do not diagnose; rather, they provide important data that must be integrated with background information, historical information and current functioning. It is essential then that the evaluator integrate all information gathered in a well-developed clinical summary. The following elements must be included in the clinical summary:

    a. Demonstration of the evaluators having ruled out alternative explanations for the identified academic problems as a result of poor education, poor motivation and/or study skills, emotional problems, attentional problems and cultural or language differences;

    b. Indication of how patterns in cognitive ability, achievement and information processing are used to determine the presence of a learning disability;

    c. Indication of the substantial limitation to learning presented by the learning disability and the degree to which it impacts the individual in the context of the USMLE; and

    d. Indication as to why specific accommodations are needed and how the effects of the specific disability are mediated by the recommended accommodation(s).

Problems such as test anxiety, English as a second language (in and of itself), slow reading without

SPR- 0022

an identified underlying cognitive deficit or failure to achieve a desired academic outcome are not learning disabilities and therefore are not covered under the Americans with Disabilities Act.

Each accommodation recommended by the evaluator must include a rationale. The evaluator must describe the impact the diagnosed learning disability has on a specific major life activity as well as the degree of significance of this impact on the individual. The diagnostic report must include specific recommendations for accommodations and a detailed explanation as to why each accommodation is recommended. Recommendations must be tied to specific test results or clinical observations. The documentation should include any record of prior accommodation or auxiliary aids, including any information about specific conditions under which the accommodations were used and whether or not they were effective. However, a prior history of accommodation, without demonstration of a current need, does not in and of itself warrant the provision of a like accommodation. If no prior accommodation(s) has been provided, the qualified professional expert should include a detailed explanation as to why no accommodation(s) was used in the past and why accommodation(s) is needed at this time.

**Attention-Deficit/Hyperactivity Disorder (ADHD)**

Documentation for applicants submitting a request for accommodations based on an Attention-Deficit/Hyperactivity Disorder (ADHD) should contain all of the items listed in the General Guidelines section. The following information explains the additional issues documentation must address relative to ADHD.

1. The evaluation must be conducted by a qualified diagnostician.

Professionals conducting assessments and rendering diagnoses of ADHD must be qualified to do so. Comprehensive training in the differential diagnosis of ADHD and other psychiatric disorders and direct experience in diagnosis and treatment of adults is necessary. The evaluator's name, title and professional credentials, including information about license or certification as well as the area of specialization, employment and state in which the individual practices should be clearly stated in the documentation.

2. Testing/assessment must be current.

The determination of whether an individual is "significantly limited" in functioning is based on assessment of the current impact of the impairment on the USMLE testing program. (See General Guidelines)

3. Documentation necessary to substantiate the Attention-Deficit/Hyperactivity Disorder must be comprehensive.

Because ADHD is, by definition, first exhibited in childhood (although it may not have been formally diagnosed) and in more than one setting, objective, relevant, historical information is essential. Information verifying a chronic course of ADHD symptoms from childhood through adolescence to adulthood, such as educational transcripts, report cards, teacher comments, tutoring evaluations, job assessments and the like are necessary.

    a. The evaluator is expected to review and discuss DSM-IV diagnostic criteria for ADHD and describe the extent to which the patient meets these criteria. The report must include information about the specific symptoms exhibited and document that the patient meets criteria for long-standing history, impairment and pervasiveness.

b. A history of the individual's presenting symptoms must be provided, including evidence of ongoing impulsive/hyperactive or inattentive behaviors (as specified in DSM-IV) that significantly impair functioning in two or more settings.

c. The information collected by the evaluator must consist of more than self-report.

Information from third party sources is critical in the diagnosis of adult ADHD. Information gathered in the diagnostic interview and reported in the evaluation should include, but not necessarily be limited to, the following:

A history of presenting attentional symptoms, including evidence of ongoing impulsive/hyperactive or inattentive behavior that has significantly impaired functioning over time; Developmental history; Family history for presence of ADHD and other educational, learning, physical or psychological difficulties deemed relevant by the examiner; Relevant medical and medication history, including the absence of a medical basis for the symptoms being evaluated; Relevant psychosocial history and any relevant interventions; A thorough academic history of elementary, secondary and postsecondary education; Review of psychoeducational test reports to determine if a pattern of strengths or weaknesses is supportive of attention or learning problems; Evidence of impairment in several life settings (home, school, work, etc.) and evidence that the disorder significantly restricts one or more major life activities. Relevant employment history; Description of current functional limitations relative to an educational setting and to USMLE in particular that are presumably a direct result of the described problems with attention; A discussion of the differential diagnosis, including alternative or co-existing mood, behavioral, neurological and/or personality disorders that may confound the diagnosis of ADHD; and Exploration of possible alternative diagnoses that may mimic ADHD.

4. Relevant Assessment Batteries

A neuropsychological or psychoeducational assessment may be necessary in order to determine the individual's pattern of strengths or weaknesses and to determine whether there are patterns supportive of attention problems. Test scores or subtest scores alone should not be used as the sole basis for the diagnostic decision. Scores from subtests on the Wechsler Adult Intelligence Scale- III (WAIS- III), memory functions tests, attention or tracking tests or continuous performance tests do not in and of themselves establish the presence or absence of ADHD. They may, however, be useful as one part of the process in developing clinical hypotheses. Checklists and/or surveys can serve to supplement the diagnostic profile but by themselves are not adequate for the diagnosis of ADHD. When testing is used, standard scores must be provided for all normed measures.

5. Identification of DSM-IV Criteria

A diagnostic report must include a review of the DSM-IV criteria for ADHD both currently and retrospectively and specify which symptoms are present (see DSM-IV for specific criteria). According to DSM-IV, "the essential feature of ADHD is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development." Other criteria include:

a. Symptoms of hyperactivity-impulsivity or inattention that cause impairment that were present in childhood.

b. Current symptoms that have been present for at least the past six months.

SPR- 0024

c. Impairment from the symptoms present in two or more settings (school, work, home).

6. Documentation Must Include a Specific Diagnosis

The report must include a specific diagnosis of ADHD based on the DSM-IV diagnostic criteria. Individuals who report problems with organization, test anxiety, memory and concentration only on a situational basis do not fit the prescribed diagnostic criteria for ADHD. Given that many individuals benefit from prescribed medications and therapies, a positive response to medication by itself is not supportive of a diagnosis, nor does the use of medication in and of itself either support or negate the need for accommodation.

7. A Clinical Summary Must Be Provided

A well written diagnostic summary based on a comprehensive evaluative process is a necessary component of the assessment. The clinical summary must include:

a. Demonstration of the evaluators having ruled out alternative explanations for inattentiveness, impulsivity, and/or hyperactivity as a result of psychological or medical disorders or noncognitive factors;

b. Indication of how patterns of inattentiveness, impulsivity and/or hyperactivity across the life span and across settings are used to determine the presence of ADHD;

c. Indication of the substantial limitation to learning presented by ADHD and the degree to which it impacts the individual in the context for which accommodations are being requested (e.g., impact on the USMLE program); and

d. Indication as to why specific accommodations are needed and how the effects of ADHD symptoms, as designated by the DSM-IV, are mediated by the accommodation(s).

8. Each accommodation recommended by the evaluator must include a rationale.

The evaluator must describe the impact of ADHD (if one exists) on a specific major life activity as well as the degree of significance of this impact on the individual. The diagnostic report must include specific recommendations for accommodations. A detailed explanation must be provided as to why each accommodation is recommended and should be correlated with specific identified functional limitations. Prior documentation may have been useful in determining appropriate services in the past. However, documentation should validate the need for accommodation based on the individual's current level of functioning. The documentation should include any record of prior accommodation or auxiliary aid, including information about specific conditions under which the accommodation was used (e.g., standardized testing, final exams, NBME subject exams, etc.).

However, a prior history of accommodation without demonstration of a current need does not in itself warrant the provision of a similar accommodation. If no prior accommodation has been provided, the qualified professional and/or individual being evaluated should include a detailed explanation as to why no accommodation was used in the past and why accommodation is needed at this time.

Because of the challenge of distinguishing ADHD from normal developmental patterns and behaviors of adults, including procrastination, disorganization, distractibility, restlessness, boredom, academic underachievement or failure, low self-esteem and chronic tardiness or inattendance, a multifaceted evaluation must address the intensity and frequency of the symptoms and whether these behaviors constitute an impairment in a major life activity.

While students receiving exam accommodations may do so in a separate location from the bulk of their classmates -- no provisions are made to allow for a private exam setting for a single student. Typically, accommodated exams (i.e., extended time, etc.) will be given to a group of accommodated students in one room, and will be continuously proctored. While the reason(s) for a student's exam accommodations are kept private from those who do not need to know -- we do not ascribe to a student's privilege to keep secret the fact they he/she is being accommodated and taking examinations under non-standard conditions.